## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| BRETT MCMAHON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 15-1269 |
| ) | |
| DUNLAP COMMUNITY UNIT SCHOOL ) | |
| DISTRICT NO. 323, JAY MARINO, ) | |
| former Superintendent, in his individual ) | |
| Capacity, and LISA PARKER, then ) | |
| Assistant Superintendent of Schools, in ) | |
| her induvial capacity. ) | |
| ) | |
| Defendants. ) | |

## <u>ORDER AND OPINION</u>

This matter is now before the Court on Defendants' Motion [13] for Summary Judgment.

For the reasons set forth below, Defendants' Motion [13] is GRANTED.

### BACKGROUND

***The District***

Unless otherwise noted, the following facts are not in dispute. Defendant Dunlap

Community Unit School District No. 323 (the "District") operates a school district in Peoria

County, Illinois. At all times relevant to this dispute, Defendant Jay Marino was the District's

Superintendent. Defendant Lisa Parker was the District's Assistant Superintendent from 2008 to

2014. Thereafter, she served as Interim Superintendent until she was named Superintendent in

January 2015. As Assistant Superintendent, Defendant Parker oversaw the operations of the

District. The directors of the various departments, including the Buildings and Grounds

Department, reported to Parker. Jim Everett was the Director of Buildings and Grounds in 2013,

where he supervised custodial and maintenance employees including Plaintiff Brett McMahon,

Phyllis Skinner, and Nancy Riekena. Parker had the primary authority for employment decisions for the departments within her purview, upon the advice of the department directors. However, Parker did not interview candidates; rather, the department directors hired their own staff and reported to Parker for approval. If Parker approved a candidate, she would speak with Superintendent Marino and submit the decision to the District's Board of Education for final approval. Doc. 13, SOF ¶¶ 1-8.

### The Plaintiff

Brett McMahon began working for the District in the summer of 2011. His position is currently groundskeeper, which is a part-time, seasonal position done exclusively—or at least largely—outside.[1] The parties dispute whether McMahon ever asked about being hired as a full-time. However, McMahon never submitted a written request for, and had never met with or asked Parker about, a full time position prior to July 2013. McMahon has never spoken to Superintendent Marino. Doc. 13, SOF ¶¶ 9-15.

### The Custodians

The basis of this dispute arises out of the District's decision to reclassify Nancy Riekena and Phyllis Skinner from part-time to full-time custodians. Nancy Riekena was hired as a part-time custodian in July 2008, where she worked seven hours per day at the grade school building doing cleaning and maintenance. She also worked many events for which she was paid overtime. Prior to 2013, Riekena applied for full time positions three different times and was rejected each time. Phyllis Skinner, or "PJ," was hired as a part-time custodian and assigned to the high school in 2010. She started out working three hours per night, which increased to five hours once she

---

[1] Plaintiff disputes that McMahon's job title was always groundskeeper, and maintains that prior to his deposition in this matter his title was custodial. See Doc. 19, Plf's Resp. at ¶ 11. However, it is undisputed that McMahon's job duties were always related to groundskeeping, which he distinguishes the work of custodians.

took over the District's mail route. She also worked various events to increase her hours, and by

June 2013, she was averaging between 35-45 hours per week. Like Riekena, Skinner has

previously applied for a full time position for which she was turned down. McMahon admitted

that he had no issues with Riekena or Skinner's job performance or qualifications, nor did

Director Everett take issue with their ability to perform custodial work. *Id*. at ¶¶ 16-21.

***The District's Policy Change***

  In 2013, the District enacted a policy change limiting part-time employees to working 29

hours or fewer per week. The District's reason for the change was to avoid the expense of

providing health insurance to part-time employees, which it anticipated it would be required to

provide to employees working more than 29 hours each week. Thus, at a meeting in June of

2013, the District's Human Resources Director, Erik Christian, informed part-time Buildings and

Grounds employees that they would no longer be permitted to work more than 29 hours. Full-

time employees were not affected by the change. *Id*. at ¶¶ 21-23.

  Shortly after the meeting, Riekena and Skinner were informed that, effective July 1,

2013, they would be reclassified from their positions as part-time employees to full-time

employees. Both Riekena and Skinner had been working 37 to 38 hours per week prior to the

reclassification, whereas other part-time custodians were working around 30 hours. Everett

specifically told Riekena and Skinner that they were being reclassified because they had been

doing full-time work and were working full-time hours. Riekena and Skinner each testified that

they would not be able to complete their job responsibilities at 29 hours a week. If Riekena and

Skinner were not promoted to full-time, each of their jobs would have had to been separated into

two part-time positions. The Parties dispute whether Riekena and Skinner's change in status

from part-time to full-time constituted a new position or opening, or whether it was simply a

reclassification. However, Plaintiff does not dispute that McMahon was not similarly reclassified because the groundskeeper position was a part-time position and the District did not believe it was necessary to make the groundskeeper position full-time. *Id*. at ¶¶ 23-29.

**Parker's Alleged Discrimination**

Plaintiff alleges that Parker's decision to make Riekena and Skinner full-time employees, and not McMahon, amounts to gender-based discrimination. The District's motion states, and Plaintiff does not dispute, the following facts in support of their argument that there is no evidence of discrimination: (1) Everett testified that Parker treats everyone fairly and does not treat employees differently based upon their sex, and has no reason to believe that sex played any role in Riekena or Skinner receiving a full-time position; (2) Neither Everett nor Plaintiff ever heard Parker making sexist comments; (3) Parker's affidavit states that the decision to reclassify Skinner and Riekena as full-time employees was not motivated by their sex; (4) McMahon admitted that he does not believe any other individual besides Parker took any action against him because of his sex; (5) McMahon admitted that he did not know if Parker's decision was motivated by sex; and (6) the only person McMahon could identify to support his claim that "men's positions were eliminated" at the District resigned and was replaced by another male. Plaintiff disputes Defendants' assertion that the only evidence he provided to support his discrimination claim is his belief that Parker is "partial to women," because "there is evidence that he had superior qualifications and was not considered for the job." Plaintiff also disputes counsel's characterization of McMahon's testimony regarding whether Riekena and Skinner's interactions with Parker while delivering mail influenced Parker's decision. *Id*. at ¶¶ 30-37.

4

*Plaintiff's Additional Facts*

Plaintiff states the following as additional material facts, which are based almost entirely on McMahon's own deposition testimony and largely disputed by Defendants. McMahon had been involved in construction for a long time, and built and renovated many homes. When a custodian called in sick, McMahon would leave his grounds post to fill in at the school doing janitorial work, and he allegedly had superior "all around skills" compared to the other employees. Plaintiff also alleges that Everett and Peterson told McMahon when he was hired in 2011 that the position would ultimately be full time. According to McMahon, Everett thought he would be a good replacement for him, but when McMahon submitted an application for Buildings and Grounds Director in 2014 (after Riekena and Skinner were promoted to full-time) he never heard back from anyone. After learning that Riekena and Skinner were given full-time positions, McMahon complained to Everett that he was not given an opportunity to apply. Everett and Principal Welsh allegedly gave no reason for the decision to McMahon, and Skinner allegedly told McMahon "I know you have a greater skill set, Bret [sic]. I know you do, but they fucked you. I am sorry about this." Doc. 19, ¶¶ 1-11.

## LEGAL STANDARD

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In resolving a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material

5

dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In order to withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). If the evidence, however, is "merely colorable, or is not significantly probative or merely raises 'some metaphysical doubt as the material facts,' summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. Thus, in order to overcome the undisputed facts set forth in a defendants' motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions or other evidence of an admissible sort that a genuine dispute of material fact exists between parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

## ANALYSIS

### (A) Compliance with Local Rule 7.1(D)

Before addressing the merits of Defendants' motion, the Court will briefly address Plaintiff's argument regarding the inefficiency of summary judgment motions and limited role of the courts in deciding them. The Court agrees that summary judgment is a strong remedy, and recognizes that its role is not to weigh the evidence or make credibility determinations. Indeed, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp*., 24 F.3d 918, 920 (7th Cir. 1994). However, the parties "bear a concomitant burden to identify

evidence that will facilitate this assessment." *Id*. The Court's Local Rules are designed to facilitate the parties by "making their respective summary judgment obligations explicit." *Id*. at 921.

Local Rule 7.1(D)(2)(b) provides that responses to motions for summary judgment must state, in separate subsections: undisputed material facts, disputed material facts, disputed immaterial facts, undisputed immaterial facts, and additional material facts. Local Rule 7.1(D)(2)(b)(6) cautions that "[a] failure to respond to any numbered fact will be deemed an admission of the fact." *Id*. This rule consistent with the Federal Rules of Civil Procedure, which provide that when a party who fails to properly address another party's assertion of fact as required by Rule 56(c), the court may, *inter alia*, "consider the fact undisputed for the purposes of the motion." Fed. R. Civ. Pro. 56(e)(2). Here, Plaintiff's fails to comply with the formatting requirements of Local Rule 7.1(D)(2) because his response does not distinguish between material and immaterial facts.

Additionally, some of Plaintiff's responses in his "Disputed Facts" do not actually dispute the Defendants' asserted fact. For example, Defendant's SOF 11 states that as a groundskeeper Plaintiffs work is done exclusively outside, custodians work exclusively inside, and they two are completely different jobs. Plaintiff's response states that this fact is disputed because Plaintiff's job was reclassified from custodial to groundskeeper the day before the deposition. However, that response does not dispute the Defendants' primary assertion—that Plaintiff has always worked outside and his job has always been different than that of the custodians. The same goes for Defendants' SOF 12, which states that Plaintiff never asked Everett about being hired as a custodian. Plaintiff's response disputes this fact, stating that Everett told him his employment

would ultimately lead to a full time position. Again, that response does not dispute (a) whether *Plaintiff* asked Everett about being hired (b) as a *custodian*.

Similarly, Defendants' SOF 13 states that Plaintiff never submitted a request in writing for a full time position. Plaintiff's response disputes that fact because "appointments were made and McMahon was never given an opportunity to apply." That response does not actually dispute that McMahon never submitted a request in writing, it just argues that his failure to apply is not relevant. In other words, the response is more appropriately designated as an undisputed immaterial fact. Argumentative responses that simultaneously deny the veracity of a defendant's proposed material fact and present separate, additional facts risk the possibility that the Court will consider defendant's proposed fact as undisputed. See e.g., *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008).

Simply put, the response section to Defendants' proposed material facts is no place for argument (SOF 11), or for making distinctions (SOF 12), or pointing out other facts to explain away the proposed fact (SOF 13). That is the purpose of the argument section. Finally, as discussed more thoroughly under section (C), romanette (i), Plaintiff's argument section does not comport with Local Rule 7.1(D)(2)(c) because it does not explain why Plaintiff disagrees with each point of law identified in the Defendants' motion. While strict, the requirements imposed on the parties by Rule 56 and Local Rule 7.1(D) are not meant to be punitive. "Rather, they are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions. They are, in short, roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own." *Waldridge*, 24 F.3d at 923. Thus, strict compliance with these rules is necessitated

8

because of the very efficiency concerns Plaintiff identifies in the argument section of his brief. Because summary judgment is such a drastic remedy, the Court regularly informs the parties when they fail to adhere to these strict requirements, and exercises its discretion to decide whether to apply the rule strictly or to overlook any transgression. *Id*. With that in mind, the Court moves on to address the merits of the instant motion.

**(B) The general framework for employment discrimination claims**

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin …" 42 U.S.C § 2000e-2(a). Until recently, motions for summary judgment in employment discrimination cases were analyzed under two "methods" of proof. Under the "direct method," the Court would evaluate whether the plaintiff presented sufficient evidence that the employer's discriminatory animus motivated an adverse employment action. *Harper v. Fulton County, Ill.*, 748 F.3d 761 (7th Cir. 2014). Under the "indirect method" or *McDonnell Douglas* burden-shifting approach, "the plaintiff has the initial burden of establishing that (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017) (internal citations omitted). If the plaintiff met that *prima facie* showing, the burden then shifted to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.

*Id*. If the employer articulates a legitimate, nondiscriminatory reason for the action, the burden

then shifts back to the plaintiff to show the employer's explanation is pretextual. *Id*.

Recently, in *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit clarified that the

correct legal standard "is simply whether the evidence would permit a reasonable factfinder to

conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the

discharge or other adverse employment action." 834 F.3d 760, 765 (7th Cir. 2016). "The

evidence must be considered as a whole, rather than asking whether any particular piece of

evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect'

evidence." *Id*. While *Ortiz* did not alter the *McDonnell Douglas* burden-shifting framework, "it is

not the only way to assess circumstantial evidence of discrimination." *David*, 846 F.3d at 224

(internal citations omitted) ("In adjudicating a summary judgment motion, the question remains:

has the non-moving party produced sufficient evidence to support a jury verdict of intentional

discrimination?").

"Because the *McDonnell Douglas* framework survived *Ortiz*," and because McMahon

"has presented [his] argument in those terms," the Court will first analyze whether Plaintiff has

established a *prima facie* case of discrimination under that approach. See *David*, 846 F.3d at 224.

Thereafter, the Court will "assess cumulatively all the evidence presented by [McMahon] to

determine whether it permits a reasonable factfinder to determine that" he would have received a

full-time position had he been a woman, and everything else remained the same. *Id*.

**(C) "Reverse discrimination" and failure to promote claims**

Here, McMahon alleges that he was denied a promotion from part-time to full-time

because of his sex. Generally, "[i]n order to establish a *prima facie* case in a failure-to-promote

context, the plaintiff must show that 1) he belongs to a protected class, 2) he applied for and was

qualified for the position sought, 3) he was rejected for that position and 4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff." *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003) (citing *Johnson v. Nordstrom, Inc.,* 260 F.3d 727, 732 (7th Cir. 2001)); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006). However, because McMahon does not belong to a protected class, the first and fourth prongs of *McDonnell* are altered.

   "Because it is the unusual employer who discriminates against majority employees, a male plaintiff alleging gender discrimination must show something more than the fact that he is gendered." *Gore v. Indiana Univ.*, 416 F.3d 590, 592 (7th Cir. 2005) (internal citations omitted). Thus, in cases of reverse discrimination where plaintiff is not part of a protected class, a plaintiff can meet the first prong of the *McDonnell* test by showing "background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against [men] or evidence that there is something 'fishy' about the facts at hand." *Id.* (internal quotations omitted); See also *Johnson v. Chicago Transit Auth.*, No. 14 C 9432, 2017 WL 1105446, at *2 (N.D. Ill. Mar. 24, 2017).

   In order to set forth a *prima facie* case of discrimination in the instant case, McMahon must show: (1) background circumstances that demonstrate that the District has reason or inclination to discriminate invidiously against men or evidence that there is something "fishy" about the facts at hand; (2) that he applied for and was qualified for the position sought; (3) he was rejected for that position; and (4) the District granted the promotion to a female who is not better qualified than McMahon. See *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003), *Carter v. Chicago State Univ.*, 778 F.3d 651, 660 (7th Cir. 2015); accord *Gore*, 416 F.3d at 592.

*(i) "Background circumstances"*

The District argues that McMahon has not provided any facts demonstrating that the Defendants were inclined to discriminate against males. In support, the District points to the absence in the record of any inference that the District or its employees made discriminatory or derogatory remarks to McMahon regarding his sex and the fact that his supervisor, Jim Everett, was male. The District further argues that the only evidence McMahon has provided is his unsubstantiated speculation that Parker was "partial to women," and McMahon admitted that he had no evidence of and was uncertain whether Parker did not like men. Finally, the District notes that McMahon's claim that men's positions were eliminated under Parker is incorrect—the only male he could identify, Erik Christian, actually resigned and was replaced by another male. Doc. 13, SOF ¶ 37.

McMahon's response begins by acknowledging that he has the burden "to prove the reasons offered by the defendant were not the true reasons, but a pretext for discrimination." Doc. 19, at 10 (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000)). The Court in *Reeves* assumed that the *McDonnell Douglas* framework applied to ADEA actions and discussed the petitioner's claims in that context:

> *McDonnell Douglas* and subsequent decisions have "established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory-treatment cases." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). First, the plaintiff must establish a prima facie case of discrimination. *Ibid.; Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
>
> *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000).

The Court assumes that Plaintiff, by discussing pretext and citing to *Reeves*, is making an argument under *McDonnell Douglas*. See *David*, 846 F.3d at 224 ("Because the *McDonnell Douglas* framework survived *Ortiz*, and because Ms. David has presented her argument in those

12

terms, we will begin our assessment of the evidence by … addressing first whether Ms. David has established a prima facie case of discrimination."). Yet Plaintiff's argument begins and ends with the issue of pretext, which only comes into play after the plaintiff establishes a *prima facie* case and the defendant articulates a nondiscriminatory reason for the action. Plaintiff's response does not attempt to articulate a *prima facie* case or respond to the Defendants' legal arguments to the contrary, even though the opinion in *Reeves* notes that, "[f]irst, the plaintiff must establish a *prima facie* case of discrimination." 530 U.S. at 142.

Nevertheless, the Court will attempt to ascertain whether Plaintiff could show "background circumstances that demonstrate that [the District] has reason or inclination to discriminate invidiously against [men] or evidence that there is something 'fishy' about the facts at hand." *Gore*, 416 F.3d at 592. The gist of McMahon's argument is that he was more qualified for the full time custodial position than Riekena or Skinner, and Parker knew Riekena and Skinner because they delivered the mail to her and were women. He also points to the fact that the full-time positions were not posted, which he alleges went against the usual procedure.

Even if taken as true, none of Plaintiff's alleged facts supports an inference that the District had a reason or inclination to discriminate against males. See, e.g., *Ineichen v. Ameritech*, 410 F.3d 956, 960 (7th Cir. 2005) ("Ineichen must present some evidence to show that it is not surprising that her supervisors would discriminate against her because she was white."). It is also doubtful that McMahon has shown that there is something "fishy" about the facts at hand. However, the Court need not swim up that stream because even assuming McMahon has satisfied the first requirement of a *prima facie* case under *McDonnell Douglas*, he has nonetheless failed to establish the fourth prong. See *Ineichen*, 410 F.3d at 960. Specifically, he has failed to show that Riekena and Skinner were less qualified for the full-time custodial

position. Alternatively, McMahon has not shown that the District's stated reason for the employment decision was pretextual.

### (ii) Whether McMahon applied for and was qualified for the position

Next, Plaintiff must establish that he applied for and was qualified for the position sought. This raises three issues: whether McMahon applied, whether he was qualified, and whether there was in fact a position open. Here, the Court will focus on the application requirement, as the relative qualifications of McMahon, Skinner, and Riekena are better addressed in the fourth prong—whether the District granted the promotion to a female who is not better qualified than McMahon—and the question of whether a position was truly open will be addressed in the context of the Districts stated reason for the decision.

It is undisputed that McMahon never submitted a written application for full-time employment until well after Skinner and Riekena were given full-time status:

> Q. Did you submit an application for that [Buildings and Grounds] position?
> A. Yes, I did.
> Q. When did you do that?
> A. Last year [2014 or 2015] when they first started looking to—right before Roger took on the position.

> Doc. 13-1, at 25-27.

However, McMahon testified that he made informal inquiries about the possibility of full-time work and he was under the impression that he would eventually become full-time. The following deposition testimony is instructive:

> Q. … Did you ever—I may have asked this, and I apologize if I have. But did you ever submit anything in writing requesting full time employment prior to July 2013?
> A. No, because they had always told me that they were going to need somebody full time for outdoors, which was really appealing to me. … And so it wasn't until they announced that we were going broke and that they created those full time positions for the ladies that I felt like, wow, I mean, they are not going to ever turn my position into full time. They would have done it right then and there. You

know, knowing that I would still have to interview for that position but that I was a strong candidate. So then—by Dwayne Peterson, Jim Everett and Tom Welsh driving home the sentiment that they were going to create a full time position for the outside, that that's what I—was my number one thing. The fact that they didn't make that into a full time position, actually went reverse, backwards, and capped the hours, added more grounds and capped the hours, that made me think wouldn't I have been able to apply for a job that pays $30 an hour, limit my responsibilities and, you know, make a lot more money and have a much stronger future with benefits and retirement and a good wage, you know? I should have been given the opportunity just as those ladies were.

*Id*. at 81-82.

Q. Did you ever discuss a full time position with Tom Welsh?
A. Oh yeah, yeah.
Q. When did you do that?
A. Prior to—prior to them telling me that—when we went into the meeting after the original meeting telling us that we were broke, a week later they called us all in a meeting into the front office. And that's where they sat us down. And they told PJ that she was full time and they told me—they called me in right after her. They said Brett, it is what it is. Take it or leave it. I said guys, what about the full time job? I said I have been busting my butt for a year and a half to prove to you guys that I am worthy of a full time position. I said did either of you guys fight for me for a position? They said, well, they just said that it is what it is. Take it or leave it.

*Id*. at 85-6.

Although a plaintiff alleging employment discrimination in a failure to promote case is generally required to show that he submitted a written application for a position, that requirement may be relaxed "where an employer ordinarily entertains applications for a certain type of job but a plaintiff is deterred from applying by the very discriminatory practices he is protesting." *Loyd v. Phillips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994). In other words, "[a]n application is unnecessary when a plaintiff can show she would have applied had it not been for the complained-of discriminatory practices." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 385 (7th Cir. 2016). Here, McMahon complains that he was prevented from applying for the full-time positions given to Riekena and Skinner because the District did not announce the position.

In *Volling*, the Seventh Circuit recognized that an "employer's 'manner' of publication may involve the discriminatory *absence* of publication," such that a prospective employee "suffers an adverse employment action despite not applying." Cf. *Volling*, 840 F.3d at 385, with *Jaburek v. Foxx*, 813 F.3d 626, 631-32 (7th Cir. 2016) (finding plaintiff did not meet requirement where her testimony about applying for position was vague and unanimously contradicted by other employees), and *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016), *cert. denied,* No. 16-533, 2017 WL 1040873 (U.S. Mar. 20, 2017) (application requirement not excused where there was no evidence that surreptitious action by employer precluded plaintiff from applying). Here, viewed in the light most favorable to him, McMahon has presented sufficient evidence to establish that he would likely have applied for a full-time position had it been posted, thus meeting the "application" requirement.[2] Plaintiff's qualifications for the job will be addressed separately, below.

### *(iii) McMahon did not receive the position*

McMahon is still employed with the District part-time. If he had a full-time position, he would undoubtedly earn more money and be eligible for benefits such as health insurance and other benefits. This is sufficient to constitute a "materially adverse employment action." See *Ribando v. United Airlines, Inc.,* 200 F.3d 507, 510 (7th Cir. 1999). Accordingly, he had made a sufficient showing to meet the third prong of the analysis.

---

[2] Although the Court finds that Plaintiff has met his burden of showing that he would likely have applied for a full time position if one had been posted, after reviewing the entirety of McMahon's deposition testimony it appears that McMahon was never interested in a custodial position. Rather, his grievance appears to arise from the fact that his part-time position as groundskeeper was not made into a full-time position. See Doc. 13, SOF ¶ 29. However, because Plaintiff has framed his argument around the custodial position, the Court will assume that McMahon was indeed interested in that position.

### (iv) Whether the District granted the promotion to a female who is not better qualified than McMahon

The gist of Plaintiff's argument is that McMahon, with his experience in construction and maintenance skills, was the most qualified for a full-time custodial position. Thus, a review of the job duties of McMahon, Rikena, and Skinner is in order. Although the parties dispute whether McMahon's job title was "groundskeeper" or "custodian," the title is immaterial; rather, the Court will look beyond the job title to the specific responsibilities of the employee. See *Grayson*, 317 F.3d at 750. McMahon worked at the District since 2011 on a part-time, seasonal basis. He worked outside, where he was the only person responsible for the upkeep of over 80 acres. Doc. 13-1, at 21. He grooms the athletic fields, picks up trash on the ground, cuts trees, removes snow, runs the tractor, and helps with the PA system. *Id*. at 52. He would also work as a substitute custodian when a custodial employee called in sick. *Id*.

Riekena was hired as a part-time custodian in 2008. She worked seven hours per day doing maintenance and cleaning inside the grade school building, and also worked many events to earn overtime pay. Before Riekena became full-time, her daily routine involved working one hour at the transportation ("DAC") building and six hours to clean the grade school building. When she was made full time, she worked a half-hour at the DAC building, two hours doing the mail run, and five hours cleaning the grade school building. Doc. 13-4, at 16-17.

Skinner was hired as a part-time custodian in 2010, where she was assigned to the high school building. Her hours soon increased from three hours per night to five hours per day, and by June 2013, she averaged between 35 and 45 hours per week. Before Skinner became full-time, she worked three hours each night cleaning the high school building and two hours each day running the mail route. She supplemented her regular hours by working events like basketball games, dances, volleyball games, and plays. After Skinner became full-time, she

gained an additional three sections of the high school building to clean and maintain, and she gave up the mail route. Doc. 13-5, at 8-9.

McMahon admits that Riekena and Skinner were qualified to do their jobs, and Jim Everett, their supervisor, testified that he never had any issue with their ability to perform their work as custodians. Doc. 13, at ¶¶ 16-21. Although McMahon characterizes Riekena and Skinner's job duties as limited to delivering mail, vacuuming, mopping floors and cleaning restrooms, Plaintiff's only support for that assertion is a citation to Plaintiff's own answers Defendants' interrogatories. Doc. 19, at 6. Both Riekena and Skinner testified about their maintenance abilities as custodians. Skinner had prior experience roofing, and as a custodian she has experience with basic plumbing as well as replacing light fixtures and cutting ceiling tiles. Doc. 13-5, at 19-21. Likewise, Riekena had experience changing lights, fixing basic plumbing and electrical issues, stripping and waxing floors, cleaning gutters, caulking windows, and maintaining the landscaping around the building. Doc. 13-4, at 21-23, 34.

Although McMahon may well be qualified to work as a custodian in positions like those of Riekena and Skinner, McMahon's job as groundskeeper is not necessarily the same or equivalent to the custodian position. See *Grayson v. City of Chicago*, 317 F.3d 745, 749 (7th Cir. 2003) ("[P]ersons who do not have the same or equivalent positions are not similarly situated with respect to a potential promotion."); *Hoffman–Dombrowski v. Arlington Int'l Racecourse, Inc.,* 254 F.3d 644, 651 (7th Cir. 2001). In *Grayson*, the plaintiff sued the City of Chicago alleging employment discrimination based on race. Grayson was the Sub-foreman of Carpenters. He applied for the positions of General Foreman of General Trades and General Foreman of Carpenters. The city promoted employees who were serving on an acting basis for those positions instead. The Seventh Circuit held that Grayson could not make out a *prima facie* case

because "Grayson's experience as a Sub-foreman of Carpenters is not equivalent to the experience Fornaciari and Biamonte have had in serving on an acting basis in the very positions to which they have been promoted." *Id*. Alternatively, the court reasoned that "even if Grayson had made out a prima facie case, the City of Chicago's reason for promoting Fornaciari and Biamonte, that they were serving in the acting positions, was a legally sufficient reason that Grayson has not shown to be pretextual." *Id*. Like the plaintiff in *Grayson*, McMahon's experience as seasonal groundskeeper is not equivalent to the experience Riekena and Skinner had working as custodians on a part-time basis "in the very positions that they had been promoted." *Id*. Therefore, McMahon is unable to set forth a *prima facie* case of discrimination.

### (v) The District offered a legitimate, nondiscriminatory justification for its decision

Even if Plaintiff could establish a *prima facie* case of discrimination, the District has offered a legitimate, nondiscriminatory justification for its employment decision. See *David*, 846 F.3d at 225 (describing burden-shifting framework). Here, it is undisputed that before Riekena and Skinner were promoted to full-time status they were averaging close to full-time hours. Doc. 13, SOF ¶ 26. It is undisputed that, because of the number of hours they were working, each of their positions would have had to been split into two part-time positions if they were not made full-time. *Id*. at ¶ 27. Finally, it is undisputed that McMahon was not given a full-time position as groundskeeper because the District did not believe it was necessary to make the groundskeeper position full-time. *Id*. at ¶ 29.

### (vi) McMahon has not shown that the District's proffered justification was a pretext for discrimination

Because the District met its burden of offering a legitimate, nondiscriminatory justification for the employment decision, the burden shifts back to Plaintiff to show that the District's justification is really a pretext for prohibited discrimination. *David*, 846 F.3d at 225.

19

Plaintiff argues that the District's explanation for not posting the jobs—that Riekena and Skinner already held the positions—was pretextual because "[e]fficient management and increase in productivity would have resulted in a search for the most qualified person" and "[a] custodian who remodels and builds houses can do all sorts of fix it and checks without calling an outside contractor." Doc. 19, at 12. Plaintiff also points to the fact that "Parker knew Riekena and Skinner because they delivered mail to her and decided to give them two full time positions denied the other 40 custodians." Finally, Plaintiff alleges that "Skinner herself stated McMahon was more qualified." *Id*.

Plaintiff's argument regarding supposed efficiency and productivity benefits of posting a position do not create a triable issue of pretext, especially when the promotion is given to someone already working in the position. See *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975 (7th Cir. 2001). As discussed above, whether or not McMahon's qualifications as a groundskeeper and homebuilder make him a superior candidate for a custodial position, that fact alone is insufficient to survive summary judgment because the Court does "not sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination." *O'Regan*, 246 F.3d at 984 (quoting *Wollenburg v. Comtech Mfg. Co.*, 201 F.3d 973, 976 (7th Cir. 2000)). Thus, "[a]lthough evidence showing that the person who was hired was less qualified than the plaintiff may sometimes suffice to show pretext, the difference must be a significant one." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 738 (7th Cir. 2006). In other words, "evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Sublett*, 463 F.3d at 738. Here, McMahon

has not shown that he was clearly better qualified than Riekena or Skinner. Nor has he shown

how the District's decision—promoting to full-time the very employees who worked in the

position on a part-time basis—was a pretext for discrimination. See *Gullett v. Town of Normal,*

*Ill.*, 156 F. App'x 837, 841 (7th Cir. 2005) ("Gullett has not explained what would be pretextual

about preferring individuals with prior experience in the Waste Division."); *Grayson v. City of*

*Chicago*, 317 F.3d 745, 749 (7th Cir. 2003) ("[T]he City of Chicago's reason for promoting

Fornaciari and Biamonte, that they were serving in the acting positions, was a legally sufficient

reason that Grayson has not shown to be pretextual.").

    Plaintiff's argument that "Parker knew Riekena and Skinner because they delivered mail

to her and decided to give them two full time positions denied the other 40 custodians" fairs no

better. Favoritism is not unlawful as long as it is not based upon a protected category, and

McMahon offers no evidence that the alleged favoritism or familiarity between Parker, Riekena,

and Skinner was based on sex. See *Preston v. Wisconsin Health Fund*, 397 F.3d 539, 541 (7th

Cir. 2005) ("Neither in purpose nor in consequence can favoritism resulting from a personal

relationship be equated to sex discrimination."). The fact that the full-time positions given to

Riekena and Skinner were "denied the other 40 custodians," some of whom were also female,

further undermines McMahon's attempt to ascribe a discriminatory motivation to Parker's

decision. Cf. *Hall v. City of Chicago*, 713 F.3d 325, 333 (7th Cir. 2013) ("Thus, unlike the cited

cases, where the existence of multiple victims permitted the jury to eliminate alternative

explanations for the discriminatory acts, here we are left to speculate which among Hall's various

traits and statuses led to Johnson's conduct.").

    Finally, Plaintiff's claim that "Skinner herself stated McMahon was more qualified" is

hearsay—an out of court statement offered to prove the truth of the matter asserted. "And

hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial, except that affidavits and depositions, which (especially affidavits) are not generally admissible at trial, are admissible in summary judgment proceedings to establish the truth of what is attested or deposed, provided, of course, that the affiant's or deponent's testimony would be admissible if he were testifying live." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (internal citations omitted). McMahon, as the proponent of hearsay, bears the burden of establishing that the statement is admissible. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). He has not done so. Therefore, to the extent that the statement is offered for its truth, McMahon's recitation of what Skinner allegedly said to him is inadmissible hearsay and will not be considered.

**(D) No reasonable factfinder could find that McMahon would have received a full-time position had he been a woman, and everything else remained the same**

Whether assessed under the framework of *McDonnell Douglas* or otherwise, Plaintiff has failed to produce sufficient evidence to support a jury verdict of intentional discrimination. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017); *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). As discussed above, McMahon has not shown that his experience as a part-time seasonal groundskeeper necessarily qualified him for the custodial position, much less that he was significantly more qualified that Riekena or Skinner. From the record, it does not appear that McMahon ever expressed an interest in a full-time custodian position until after he learned that Riekena and Skinner were made full-time employees. Nor does McMahon dispute that Riekena and Skinner were qualified for the position. Yet even if McMahon could show that he was qualified for, applied, and was rejected for a position in favor of someone less qualified, McMahon has not provided any evidence at all— aside from the fact that Parker is a female, and Riekena and Skinner are both females—to show

that the District's actions were motivated by his gender. In sum, McMahon has failed to "produce something more to suggest that, among the various explanations for [the District's] actions, [it] was motivated by gender." *Hall v. City of Chicago*, 713 F.3d 325, 333 (7th Cir. 2013).

McMahon has also failed to present any evidence to show that the District's stated reason for the decision, that Riekena and Skinner already held the position on a part-time basis, was pretextual. Like *Grayson*, the District's decision to promote Riekena and Skinner to full-time because they were already serving in those positions on a part-time basis is a legally sufficient reason that McMahon has not shown to be pretextual. See *Grayson*, 317 F.3d at 749. In short, Plaintiff provides only his own deposition testimony to make his case. In some cases, that may be enough. In this case, on the record before the Court, Plaintiff's assertions are unsupported by any other evidence and are certainly not sufficient to rebut the Defendants' nondiscriminatory reason for their actions. As such, viewed as a whole, McMahon has failed to present evidence that would permit a reasonable factfinder to support a verdict of intentional discrimination. *David*, 846 F.3d at 225. Accordingly, Defendants are entitled to summary judgment in their favor.

## CONCLUSION

For the reasons stated above, Defendants' Motion [13] for Summary Judgment is GRANTED.

This matter is now terminated.

Signed on this 6th day of April, 2017.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge

23